```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
TRUSTEES OF THE FULTON FISH MARKET                                 :
PENSION FUND,                                                      :
                                                                   :
                                    Plaintiffs,                    :      22-CV-187 (JMF)
                                                                   :
                -v-                                                :      OPINION AND ORDER
                                                                   :
M. SLAVIN & SONS, LTD. et al,                                      :
                                                                   :
                                    Defendant.                     :
                                                                   :
-------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Plaintiffs are trustees of a multi-employer labor-management pension fund for employees of businesses at the New Fulton Fish Market in the Bronx. In 2019, M. Slavin & Sons, Ltd. ("M. Slavin"), a seafood retailer, wholesaler, and distributor based in the fish market, closed shop and withdrew from the agreements that obligated it to contribute to the fund. Plaintiffs brought this action to recover M. Slavin's withdrawal liability against, among others, M. Slavin; Oceanbox Wholesale LLC ("Oceanbox"), a company that acquired M. Slavin; and Mitchell Slavin, a former owner of M. Slavin and the sole owner of Oceanbox. *See* ECF No. 1. The Court previously entered default judgment against M. Slavin, *see* ECF No. 43, after which the parties stipulated to dismissal of all remaining claims other than Plaintiffs' claim of successor liability against Oceanbox, *see* ECF No. 71. Now pending are Plaintiffs' and Oceanbox's cross-motions for summary judgment as to that claim. *See* ECF Nos. 72, 74. The vast majority of the relevant facts are undisputed. Instead, the parties' disputes turn on application of the law to those facts — namely, on whether Oceanbox had the requisite notice of M. Slavin's withdrawal liability and whether Oceanbox is in "substantial continuity" with M. Slavin. For the reasons that follow, the

Court agrees with Plaintiffs on both scores. Accordingly, their motion for summary judgment is GRANTED, and Oceanbox's cross-motion for summary judgment is DENIED.

## BACKGROUND

The relevant facts — taken from the joint statement of material facts that the parties filed pursuant to Local Civil Rule 56.1, ECF No. 68 ("Joint Rule 56.1 Stmt."), and admissible materials jointly submitted by the parties, *see* ECF No. 69 — are undisputed unless otherwise indicated. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Until it ceased operations in 2019, M. Slavin was a seafood retailer, wholesaler, and distributor located in Unit 66 of the New Fulton Fish Market in the Bronx. Joint Rule 56.1 Stmt. ¶¶ 7, 26-27. More specifically, M. Slavin maintained a retail business on the floor of the Market and a wholesale business catering to other seafood distributors, restaurants, and hotels, including the Marriott, the Hilton, and the Hyatt. *Id.* ¶¶ 27-29. M. Slavin also facilitated a home-delivery business called Oceanbox E-Commerce Corp. *Id.* ¶ 114; *see also* ECF No. 69-6, at 36-37. In addition to Unit 66 at the New Fulton Fish Market, M. Slavin owned boats, a squid processing facility, and a second distribution center in Arlington, Virginia. Joint Rule 56.1 Stmt. ¶¶ 26, 39.

Mitchell Slavin began working at M. Slavin in 1980 and served as its Vice President until his resignation in 2019. *Id.* ¶¶ 30-31. In 2011, upon M. Slavin's exit from Chapter 11 bankruptcy, Barry Slavin (Mitchell's uncle) acquired a 50% ownership interest in the company; Cindy Slavin (Mitchell's sister) acquired a 25% interest, and Mitchell Slavin acquired the remaining 25%. *Id.* ¶¶ 32-34. At the time of M. Slavin's closure in 2019, Mitchell Slavin, Barry Slavin, Cindy Slavin, and Chuck Clayton (Cindy's husband) acted as managers at the company and therefore had signatory authority over M. Slavin's bank accounts. *Id.* ¶ 43. In reality, however, Herbert Slavin (Mitchell's and Cindy's father) controlled the company and made most

decisions on its behalf. *Id.* ¶ 45. During his employment at M. Slavin, Mitchell Slavin worked out of M. Slavin's cooperative facility at the New Fulton Fish Market, managing M. Slavin's sales, market operations, and employees. *Id.* ¶¶ 36-38. Mitchell Slavin had "zero control" over M. Slavin except to the extent that "[he] managed the selling floor" and the "day-to-day market function of M. Slavin." *Id.* ¶¶ 46, 50; ECF No. 69-7 ("Mitchell Slavin Tr."), at 18-19.

At all relevant times, M. Slavin was party to a series of collective bargaining agreements ("CBAs") with the United Seafood Workers Smoked Fish & Cannery Union, Local 359, United Food and Commercial Workers International Union, AFL-CIO (the "Union"). Joint Rule 56.1 Stmt. ¶ 9. It was well known that M. Slavin was a union shop; indeed, *all* stands at the New Fulton Fish Market were unionized. *Id.* ¶ 25. Pursuant to the CBAs, M. Slavin was required to make contributions to a multi-employer labor-management pension fund of which Plaintiffs are trustees (the "Fund"). *Id.* ¶¶ 10-11. Cindy Slavin was primarily responsible for liaising with the Union; adjusting, negotiating, and paying employee wages; and managing the payroll. *Id.* ¶¶ 51-52. Cindy Slavin did not discuss the CBAs with Mitchell Slavin, but the latter was aware that M. Slavin was "a party to the collective bargaining agreement with the . . . Fund" and had the ability and authority to contact the Union to discuss labor issues as necessary. *Id.* ¶¶ 48-49, 55.

In November 2018, M. Slavin defaulted on a loan of approximately $1.3 million from North Mill Capital LLC. *Id*. ¶¶ 64-66. M. Slavin then hired a firm to market the company internationally, but the effort failed to yield any buyers. *Id.* ¶ 69. Ultimately, only one entity made an offer to purchase the company: Oceanbox. *Id.* ¶¶ 70-71. Mitchell Slavin founded Oceanbox in January 2019 — one month before he resigned from his position as Vice President of M. Slavin (although not from his position as sales manager) — and, to this day, is its sole owner. *Id.* ¶¶ 60-62, 68, 70-75, 83. Mitchell Slavin negotiated the transaction on behalf of

3

Oceanbox. *Id.* ¶¶ 3, 5, 77. Cindy Slavin negotiated it on behalf of M. Slavin. *Id.* ¶ 78. On June 6, 2019, the two entities — with the approval of North Mill Capital, which had a lien on all of M. Slavin's assets, *see id.* ¶¶ 71, 73, 80 — entered into an Asset Purchase Agreement pursuant to which Oceanbox purchased certain assets of M. Slavin. *Id.* ¶¶ 71-75; *see also* ECF No. 69-18 ("Asset Purchase Agmt.").

> Specifically, Oceanbox acquired the following assets from M. Slavin:
>
> accounts receivables (market, wholesale and intercompany), all fixed assets (including equipment as defined by Seller's financial statements), goodwill, inventory, trademarks and trade name, domain names, website, receivable insurance policies to the extent transferable, and customer files and records . . . all records and files pertaining to the operation of the Business as requested by Purchaser including customer lists, work files, invoices, bills of lading, mailing records and contracts . . . all licenses, permits and accreditation relating to the Business . . . and all telephone and facsimile numbers.

*Id.* ¶ 82; *see* Asset Purchase Agmt. Mitchell Slavin, "by and through the Asset Purchase Agreement turned M. Slavin into Oceanbox Wholesale," Joint Rule 56.1 Stmt. ¶ 79, but he intended for it be "fully independent . . . of M. Slavin," *id.* ¶¶ 91, 107. Oceanbox, by and through Mitchell Slavin, knew that M. Slavin had been party to CBAs with the Union and knew of "M. Slavin's potential liabilities at the time of the asset purchase." *Id.* ¶¶ 93-94.

M. Slavin ceased all operations in June or July of 2019, following execution of the Asset Purchase Agreement with Oceanbox. *Id.* ¶¶ 41, 88, 105. In August 2019, M. Slavin was evicted from Unit 66 in the New Fulton Fish Market. *Id.* ¶ 40. Oceanbox began operations as a seafood distribution company in July 2019, one day after M. Slavin ceased its operations. *Id.* ¶¶ 84-86. Until then, Oceanbox had not owned any assets or operated in any capacity. *Id.* ¶¶ 92, 101. Oceanbox acquired the employees of M. Slavin, and at least thirteen of M. Slavin's former employees began working at Oceanbox after the acquisition, performing the same duties they had performed at M. Slavin. *Id.* ¶¶ 95-97. Mitchell Slavin also began working as an employee

4

at Oceanbox. *Id.* ¶ 87. As the sole owner of Oceanbox, he manages purchases and company financials and supervises sales personnel and other employees. *Id.* ¶ 90.

Oceanbox now sells and distributes the same product that M. Slavin had sold and distributed, to a similar clientele, using the same processes. *Id.* ¶¶ 85, 98-99. Oceanbox also facilitates Oceanbox E-Commerce Corp.'s home delivery business, just as M. Slavin did. *Id.* ¶ 114. But Oceanbox does not use M. Slavin's phone numbers and does not operate a market business at the New Fulton Fish Market. *Id.* ¶¶ 106, 108. Instead, Oceanbox entered into a lease for promises located at 300 Manida Street in the Bronx — approximately one half mile from the New Fulton Fish Market — and conducts all of its operations from that location. *Id.* ¶¶ 111-13. Finally, Oceanbox, unlike M. Slavin, is not a union shop; it is not a party to any CBA, and it has no obligation to make contributions to any union fund. *Id.* ¶¶ 109-10.

By letter dated March 3, 2020 (the "Notice and Demand"), the Fund notified M. Slavin that the company's withdrawal from the Fund during the plan year beginning January 1, 2019, had generated a withdrawal liability in the amount of $554,474. *Id.* ¶ 14; *see also* ECF Nos. 69-11, 69-12.[1] According to Cindy Slavin — testifying in her personal capacity and *not* as a representative of M. Slavin — M. Slavin was not made aware of any withdrawal liability prior to the Notice and Demand, *id.* ¶¶ 56, 58, and in or about May 2019 had negotiated a settlement of $50,000 with the Union to "wipe out any debt in terms of welfare and pension contributions," *id.* ¶ 57, *see also* ECF No. 69-8 ("Cindy Slavin Tr."), at 35. An "attorney that was representing the

---

[1] That amount included interest and liquidated damages because, under the Fund's Policy for Delinquent Contributions, M. Slavin was required to pay interest on any past due contribution at the rate of prime plus two percent and liquidated damages equal to 20% of the delinquent contributions. Joint Rule 56.1 Stmt. ¶ 11; *see also* ECF No. 69-10, at 2, 9-10. The Policy also provides that M. Slavin is responsible for all attorneys' fees and costs incurred by the Fund in its efforts to collect the past due contributions. Joint Rule 45.1 Stmt. ¶ 12.

5

pension" allegedly told her that "there was zero liability" after M. Slavin's payment of the settlement. Cindy Slavin Tr. 35-36. *But see* ECF No. 79 ("Pls.' Reply"), at 6. Significantly, however, Cindy Slavin did not discuss any potential or actual withdrawal liability with Mitchell Slavin prior to March 2020, when the Notice and Demand was received. *Id.* ¶ 58.

In January 2022, Plaintiffs filed this action against M. Slavin, Oceanbox, various entities affiliated with Oceanbox, and Mitchell Slavin, seeking to recover M. Slavin's withdrawal liability in the principal amount of $554,474, plus interest, liquidated damages, attorneys' fees, and costs. *See* ECF No. 1. After M. Slavin's counsel withdrew and the company failed to retain new counsel, the Court entered default judgment against M. Slavin in the amount of $784,777.88, consisting of $554,474 in withdrawal lability, $97,618.37 in interest accrued from September 16, 2022, $110,894.80 in liquidated damages, $20,845 in attorneys' fees, and $945.71 in costs. *See* ECF No. 43. The parties then stipulated to dismissal of all claims against all Defendants other than Plaintiffs' claim of successor liability against Oceanbox. *See* ECF No. 71; *see also* ECF No. 1, ¶¶ 41-55. The pending cross-motions for summary judgment seek resolution of that sole remaining claim. *See* ECF Nos. 72, 74.

## LEGAL STANDARDS[2]

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[2] "The law is unclear whether the substantial continuity test is to be decided ultimately by the Court or by the finder of fact." *Bautista v. Beyond Thai Kitchen, Inc.*, No. 14-CV-4335 (LGS), 2015 WL 5459737, at *4 (S.D.N.Y. Sept. 17, 2015) (citing cases); *see also Grant v. HER Imports NY, LLC*, No. 15-CV-5100 (DLI) (LB), 2018 WL 3133454, at *17 (E.D.N.Y. Feb. 16, 2018). The Court need not and does not address the question here because, as noted, the disagreement here is legal, not factual, in nature. That is, the Court "assumes without deciding that the question is one for the jury and applies the usual summary judgment standard." *Bautista*, 2015 WL 5459737, at *4.

a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35-36 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

Where both sides move for summary judgment, as here, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id*.  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

**DISCUSSION**

The Second Circuit has squarely held that a successor can be held accountable for withdrawal liability under ERISA. *See, e.g.*, *N.Y. State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers Inc.*, 24 F.4th 163, 178-79 (2d Cir. 2022). Such successor liability is a "deviation from the general common law rule" that "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Id.* at 176-77 (internal quotation marks omitted); *see also Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 88 (S.D.N.Y. 2017) (explaining that the doctrine was "designed to impose liability upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies").[3] To establish successor liability in this context, "(1) [the] successor must have notice of its predecessor's liability, and (2) there must be 'substantial continuity of identity in the business enterprise.'" *C&S Wholesale Grocers Inc.*, 24 F.4th at 177 (quoting *Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers*, 991 F.2d 997, 1001 (2d Cir. 1993)); *see Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 404-05 (S.D.N.Y. 2012).[4] The Court will address each prong of this "substantial continuity" test in turn.

---

[3] For that reason, it is immaterial whether there was an "express or implied agreement that Oceanbox assumed M. Slavin's liabilities." Def.'s Reply 10. Indeed, in *C&S Wholesale Grocers*, the Second Circuit explicitly rejected the argument that "*purchasers* can *only* assume [withdrawal] liability by consent," holding that "if purchasers find a way to *not* assume withdrawal liability pursuant to the terms of the asset sale — but they do, in fact, qualify as successors under the substantial continuity doctrine — they may still be liable." 24 F.4th at 180 (internal quotation marks omitted).

[4] Although not mentioned by the Second Circuit in *C&S Wholesale Grocers*, some courts have treated "the ability of the predecessor to provide adequate relief directly" as a third "critical factor[]." *Xue Ming Wang*, 262 F. Supp. 3d at 90; *see also Salazar v. Bija 203 Inc.*, No. 21-CV-11028 (PAC), 2023 WL 6276689, at *7 (S.D.N.Y. Sept. 26, 2023). The parties do not address this factor in their briefing, but the stipulated facts (and the procedural history of this litigation) make plain that M. Slavin cannot provide adequate relief directly to Plaintiffs. Accordingly, the Court focuses solely on the other two factors.

**A. Notice**

To establish the first prong, a plaintiff must show that the new company had notice of the "potential liability." *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 185 (1973); *accord Battino*, 861 F. Supp. 2d at 405. Significantly, notice can be actual *or* constructive, defined as "notice of any facts that 'one using reasonable care or diligence should have.'" *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839, 845 (9th Cir. 2018) (quoting *Constructive Knowledge*, Black's Law Dictionary (10th ed. 2014)); *accord Bd. of Trustees of Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997-98 (7th Cir. 2016). But "imputing [] constructive notice is appropriate only when certain 'red flags,' such as [a] 'suspiciously low purchase price and uncharacteristically quick closing' . . . 'should have led the defendant to inquire further into the circumstances of the transaction." *Diaz v. Slayton One Cleaner Inc.*, No. 17-CV-1311 (LTS) (KNF), 2018 WL 4935831, at *5 (S.D.N.Y. Oct. 11, 2018) (quoting *Xue Ming Wang*, 262 F. Supp. 3d at 93); *see also Salazar*, 2023 WL 6276689, at *7 (holding that the defendant had constructive notice based on the "red flag[]" that the defendant's "assumption of [the predecessor company's] debt was the purchase price" and given the defendant's failures to "tak[e] steps to understand the scope of details of [the predecessor company's] debt"); *Ji Li v. New Ichiro Sushi, Inc.*, No. 14-CV-10242 (AJN), 2020 WL 2094095, at *6 (S.D.N.Y. Apr. 30, 2020) (Nathan, J.) (noting that "red flags . . . such as a suspiciously good deal or an uncharacteristically quick closing" may provide constructive notice but that allegations showing merely that the "transactional agreement may have been unusual" are insufficient).

The Seventh Circuit's decision in *Full Circle Group* and the Ninth Circuit's decision in *Heavenly Hana* are especially instructive here. In *Full Circle Group*, a shipping company

owner's son acquired his father's company the year after he started working there. 826 F.3d at 995-96. Considering the question of whether the son's new company inherited the withdrawal liability of his father's company, the Seventh Circuit held that the son's "know[ledge] that [his father's company] was unionized" was enough to give him constructive notice of any withdrawal liability because the son "would almost certainly also have known that the company would be required to contribute to a union pension fund" and "could have verified [the possibility of withdrawal liability] by asking [the acquired company] to get an estimate from the union." *Id.* at 997. "A lack of familiarity with the concept of withdrawal liability [was not] an excuse," as the son had access to advisers who were familiar with not only the concept but also "the fact . . . that *most* union pension funds are underfunded." *Id.* In *Heavenly Hana*, the buyer of a unionized hotel not only received incorrect legal advice that "absent an express assumption of liability, the [b]uyer does not assume [] withdrawal liability," but also was never provided with "notice of Plan funding deficiencies" as required by the purchase agreement. *Heavenly Hana*, 891 F.3d at 843 (alterations adopted). Even so, the Ninth Circuit held that the buyer had constructive notice of the hotel's withdrawal liability. *Id.* at 844. The Court explained that "purchasers are in the best position to ensure withdrawal liability is accounted for during an asset sale" because they, unlike sellers or even pension plans, "have the incentive to inquire about potential withdrawal liability in order to avoid unexpected post-transaction liabilities." *Id.* at 846-47. It was enough, the Court concluded, that "the employees at [the hotel] were unionized," that the hotel "had contributed to a multiemployer pension plan," and that the pension plan's "annual funding notices . . . were publicly available on the internet." *Id.* at 847.

      Measured against these standards, Oceanbox plainly had notice of M. Slavin's potential withdrawal liability. To be sure, it did not have actual notice. *See* ECF No. 78 ("Def.'s Reply"),

10

at 2; ECF No. 75 ("Pls.' Mem."), at 9-11.  But there were many "red flags" that "should have led [Oceanbox] to inquire further into the circumstances of the transaction" and, thus, gave rise to constructive notice.  *Xue Ming Wang*, 262 F. Supp. 3d at 93.  For example, by the time of the June 2019 transaction, M. Slavin had already defaulted on its loan obligations and fallen behind on rent for its unit at the New Fulton Fish Market, Joint Rule 56.1 Stmt. ¶ 40; Mitchell Slavin Tr. 17, and North Mill had placed a lien on the company's assets, *see* ECF No. 69-29; ECF No. 69-28.  Moreover, Oceanbox was the only potential buyer despite an international marketing campaign, and it ultimately acquired M. Slavin's assets for a purchase price equal to the "payoff" amount of the North Mill loan.  Joint Rule 56.1 Stmt. ¶ 69; *see Salazar*, 2023 WL 6276689, at *7 (describing how the defendant's "assumption of [the predecessor company's] debt was the purchase price" was a "red flag[]" that can provide constructive notice); *New Ichiro Sushi, Inc.*, 2020 WL 2094095, at *6 (same, regarding "a suspiciously good deal or an uncharacteristically quick closing").  What is more, Mitchell Slavin, Oceanbox's principal, had first-hand knowledge of M. Slavin's financial instability and delinquency as its part owner and Vice President.  *See* Joint Rule 56.1 Stmt. ¶¶ 31, 34-35, 44, 65.  And he was aware that M. Slavin was "party to a collective bargaining agreement with the . . . Fund," and he "had the authority and ability to contact the Union to discuss labor issues." *Id.* ¶¶ 48-49, 55.  In short, Oceanbox plainly "had an opportunity to protect itself by investigating the possible liability and negotiating a purchase price that would take it into account." *Full Circle Grp., Inc.*, 826 F.3d at 997.

Contrary to Oceanbox's argument, *see, e.g.*, Def.'s Reply 9, Cindy Slavin's testimony — that an "attorney that was representing the pension" had told her in "April or May of . . . 2019" that a $50,000 settlement payment to the Union "wipe[d] out any debt, in terms of welfare and pension fund," leaving M. Slavin with "zero liability," Cindy Slavin Tr. 35-36 — does not affect

11

this conclusion. First, to the extent that her testimony is offered for the truth, it is "rank hearsay and therefore cannot defeat a motion for summary judgment." *Hall v. Urban Assembly, Inc.*, No. 19-CV-11572 (JMF), 2022 WL 19708, at *4 (S.D.N.Y. Jan. 3, 2022); *see Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005). Second, to the extent her testimony is offered to prove state of mind, she was testifying in her personal capacity, not as a corporate representative, Joint Rule 56.1 Stmt. ¶¶ 56-58, so her knowledge is not imputable to M. Slavin. And third, in any event, it is the knowledge of the *buyer* — Oceanbox — not the *seller* — M. Slavin — that matters, and there is no evidence that Mitchell Slavin or Oceanbox believed (correctly or incorrectly) that M. Slavin had no withdrawal liability to the Fund. *See Heavenly Hana*, 891 F.3d at 848 (holding that "a seller's conduct" cannot "absolve a purchaser from responsibility for withdrawal liability" where the "purchaser can undertake simple steps to gain knowledge of the withdrawal liability"). In fact, it is undisputed that "Cindy Slavin did not have any discussions about any potential withdrawal liability, or any actual withdrawal liability with Mitchell Slavin prior to March 2020." *Id.* ¶ 59.

In short, Oceanbox plainly had notice of M. Slavin's potential withdrawal liability.

**B. Substantial Continuity**

That leaves whether there is "substantial continuity of identity in the business enterprise." *C&S Wholesale Grocers*, 24 F.4th at 177. In evaluating that prong of the successor liability test, courts consider a host of factors, including "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* (quoting *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987)); *see*

12

*Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) (citing *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1094 (6th Cir. 1974)). "No one" of these factors "is controlling, and it is not necessary that each factor be met to find successor liability." *Battino*, 861 F. Supp. 2d at 405 (quoting *EEOC v. Barney Skanska Const. Co.,* No. 99-CV-2001 (DC), 2000 WL 1617008, at *2 (S.D.N.Y. Oct. 27, 2000) (Chin, J.)). "Ultimately, the question of whether there is substantial continuity between a predecessor and a successor is primarily factual in nature and is based upon the totality of the circumstances of a given situation." *C&S Wholesale Grocers*, 24 F.4th at 178 (internal quotation marks omitted).

Whether the second prong of the test is met here is a closer call, but the Court concludes that the "totality of the circumstances" ultimately falls on Plaintiffs' side of the line. First, there is some continuity of ownership: Mitchell Slavin, the sole owner of Oceanbox, was a 25% owner of M. Slavin. Joint Rule 56.1 Stmt. ¶ 8. Second, Oceanbox acquired all or virtually all of M. Slavin's transferable assets, including "accounts receivable (market, wholesale and intercompany), all fixed assets (including equipment . . . ), goodwill, inventory, trademarks and trade name, domain names, websites, receivable insurance policies . . . , and customer files and records." Asset Purchase Agmt. 2. Third, it also acquired M. Slavin's employees. *See* Joint Rule 56.1 Stmt. ¶ 95. Indeed, after the acquisition, at least fourteen of M. Slavin's former employees — including Mitchell Slavin himself — began working at Oceanbox, performing the very same duties that they had performed at M. Slavin. *Id.* ¶¶ 36-38, 90, 96-97. Fourth, contrary to Oceanbox's argument that it does not "have the same production process, produce the same products, [or] have the same body of customers as M. Slavin," ECF No. 73 ("Def.'s Mem."), at 22, the parties have stipulated that Oceanbox sells and distributes the same product as M. Slavin, uses the same processes as M. Slavin, and caters to a customer base of mostly the same

customers. *See* Joint Rule 56.1 Stmt. ¶¶ 85, 98-99; *compare* ECF No. 69-21 (M. Slavin customer list), *with* ECF No. 69-22 (Oceanbox customer list). And finally, Oceanbox seamlessly picked up where M. Slavin left off. Oceanbox — which did not own any assets or operate in any capacity before the acquisition — began operating as a full-fledged seafood distribution company only one day after M. Slavin ceased its operations. *Id.* ¶¶ 84-86, 92, 101.

These facts are similar to, if not more substantial than, those that courts have found sufficient to establish substantial continuity in other cases. *See, e.g.*, *Fall River Dyeing*, 482 U.S. at 44 (noting that Fall River Dyeing "acquired most of [the predecessor company's] real property, its machinery and equipment, and much of its inventory and materials," that its employees' "jobs did not change," and that it used the "same machines" under similar supervision); *N.L.R.B. v. DeBartelo*, 241 F.3d 207, 212 (2d Cir. 2001) (affirming the district court's finding of substantial continuity based in part of the lack of "any hiatus" (citing, *inter alia*, *Canteen Corp. v. N.L.R.B.,* 103 F.3d 1355, 1361 (7th Cir. 1997); *N.L.R.B. v. Aquabrom, Div. of Great Lakes Chemical Corp.,* 855 F.2d 1174, 1179 (6th Cir.1988))); *Salazar*, 2023 WL 6276689, at *8 (noting that the new company "used the same methods of production to sell the same product" and "used the same workforce" in its early stages (internal quotation marks omitted)); *Bd. of Trustees of Local Union No. 373 v. Mid Orange Mech. Corp.*, No. 17-CV-2669 (NSR), 2024 WL 2213474, at *5 (S.D.N.Y. May 16, 2024) (noting the new company drew the majority of its total revenue from "customers that had previously been customers of [the predecessor] company]," "purchased from [the predecessor company] tools, equipment, a pickup truck, and three vans," and hired "eight of [the predecessor company's] nine employees"); *see also Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1097 (9th Cir. 2015) ("The customer base inquiry is critical in [the

14

withdrawal liability] context because it is pertinent to the statutory concern with continuity of contribution rates when business changes take place."); *cf. Fall River Dyeing,* 482 U.S. at 45 (noting that a significant "hiatus" in operations weighs against a finding of "substantial continuity").

To be sure, as Oceanbox emphasizes, there are some facts that weigh against a finding of substantial continuity: Oceanbox is much smaller in scale than M. Slavin was, uses a different name, operates out of a different location, has different phone numbers, employs a non-union staff, and has a different ownership structure. *See* Def.'s Mem. 20-23; Def.'s Reply 12-16.[5] But for one thing, there is less to some of these facts than first meets the eye. For example, the Oceanbox name is not completely unrelated to M. Slavin; M. Slavin facilitated a home delivery business called Oceanbox E-Commerce Corp., an aspect of the business that Oceanbox has continued. Joint Rule 56.1 Stmt. ¶ 114. And while Oceanbox operates out of a different location, that is because Oceanbox continued only the distribution, not the retail, aspects of M. Slavin's business, and was not a union shop, as the New Fulton Fish Market requires. *Id.* ¶¶ 25, 109. Moreover, M. Slavin's unit at the New Fulton Fish Market was not a transferable asset; it had fallen behind on rent payments by the time of the acquisition and was ultimately evicted from the Market. *Id.* ¶ 40. In any event, Oceanbox is located only about half a mile from the New Fulton Fish Market and, thus, operates out of the same neighborhood as M. Slavin did.[6] *See id.* ¶¶ 7, 112; Pls.' Reply 9.

---

[5]   Oceanbox also invokes Mitchell Slavin's testimony that he formed Oceanbox "with the intention of it being fully independent of M. Slavin." Def.'s Mem. 22 (citing Mitchell Slavin Tr. 27). But the substantial continuity test is an objective one. If the subjective (and presumably self-serving) intentions of a purchaser were sufficient to avoid liability, successor liability would never apply.

[6]   Additionally, as far as the Court can tell, the cases that rely heavily on the fact that a putative successor operates from "an entirely different location" to find a lack of substantial

More significantly, the test is one of *substantial* continuity, not *complete* continuity, and "[n]o one" fact or factor "is controlling" or "necessary" for a finding of successor liability. *Battino*, 861 F. Supp. 2d at 404.  And ultimately, the facts pointing in Oceanbox's direction, even taken together, are not enough to tip the balance in its favor.  Indeed, where, as here, other circumstances weigh strongly in favor of substantial continuity, courts have imposed successor liability despite many of the same facts upon which Oceanbox relies.  *See, e.g.*, *Mid Orange Mech. Corp.*, 2024 WL 2213474, at *6 (finding substantial continuity even though the new company was, unlike the predecessor company, "a non-union company," and the new company "generated less than 20% of revenue of [the predecessor company] and employed a workforce that was approximately 10% of the workforce of [the predecessor company]"); *E.E.O.C. v. Nichols Gas & Oil, Inc.*, 688 F. Supp. 2d 193, 202-03 (W.D.N.Y. Jan. 14, 2010) (finding substantial continuity even though the predecessor company's owner "was moved from his supervisory position to that of a salesman, and a new manager was placed in control" of the new facility); *see also Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*, 656 F. Supp. 2d 314, 330 (N.D.N.Y. Aug. 31, 2009) (concluding that there remained a genuine dispute of material fact as to substantial continuity where the new company used a different name *and* was formed "to address [a different] aspect of the tech market"); *Guan v. Lash Princess 56 Inc.*, No. 22-CV-2552 (KPF), 2023 WL 2242050, at *8 (S.D.N.Y. Feb. 27, 2023) (holding that the plaintiff adequately pleaded successor liability by alleging "that the same supervisory personnel exist[ed]" and that the successor business "provide[d] the same services," even though the successor business "operate[d] from a different location"); *cf. N.L.R.B. v. DeBartelo*, 241 F.3d 207, 212 (2d Cir.

---

continuity have generally involved restaurants.  *E.g.*, *Chen v. L&L New Beginnings LLC*, No. 21-CV-11225 (VEC), 2022 WL 2306946, at *3 (S.D.N.Y. June 27, 2022).  Location plainly matters more for a restaurant business than for a seafood-distribution business.

2001) ("It is well-established . . . that, standing alone, a change in the size of the bargaining unit will not generally destroy the otherwise substantial continuity between the old and new employers.").

## CONCLUSION

In sum, Oceanbox had notice of M. Slavin's potential withdrawal liability and the totality of the circumstances supports a finding of substantial continuity from M. Slavin to Oceanbox. Oceanbox is therefore subject to successor liability for M. Slavin's withdrawal liability. Indeed, "absent the imposition of successor liability" here, "present and future employer participants in the union pension plan [would] bear the burden of [M. Slavin's] failure to pay its share, which [would] threaten the health of the plan while [Oceanbox] reaps a windfall." *C&S Wholesale Grocers*, 24 F.4th at 179 (internal quotation marks omitted). Accordingly, and for the reasons stated above, Plaintiffs' motion for summary judgment is GRANTED, and Oceanbox's cross-motion is DENIED.

Within **one week of this Opinion and Order**, Plaintiffs shall confer with Oceanbox and file an agreed-upon proposed judgment consistent with this Opinion and Order. In the meantime, the Clerk of Court is directed to terminate ECF Nos. 72 and 74.

SO ORDERED.

Dated: August 12, 2024
      New York, New York
                                               JESSE M. FURMAN
                                          United States District Judge